Filed 10/8/20  P. v. Latiolait CA2/1
(unmodified opinion attached)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PHILLIP JOHN LATIOLAIT,<br><br>    Defendant and Appellant. | B296973<br><br>(Los Angeles County Super. Ct. No. BA457079)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 1, 2020, be modified as follows:

1.    On page 15, the following paragraphs are added after the last paragraph in section B.1. of the Discussion section:

Defendant contends that our high court's decision in *People v. Stewart* (1976) 16 Cal.3d 133 (*Stewart*) is "on all fours" with the facts of the case before us.  It is not.

First, the appellate challenge in *Stewart* was to the trial court's giving incomplete instructions as to defendant's claim that he "was authorized" to take funds out of a company half owned by his father-in-law to invest in the stock market. Unlike here, the high court was not reviewing an ineffective assistance of counsel claim, but instead, instructional error by the trial court, which would be subject to the traditional harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18—whether the reviewing court could determine " 'beyond a reasonable doubt that the [trial court] error complained of did not contribute to the verdict obtained.' " (*People v. Aranda* (2012) 55 Cal.4th 342, 363, 367.) Under the traditional harmless error analysis, "[w]hen there is ' "a reasonable possibility" ' that the [trial court's] error might have contributed to the verdict, reversal is required." (*Id.* at p. 367.) By contrast, and as noted earlier in our discussion, where the claim is for ineffective assistance of counsel, a defendant demonstrates prejudice by showing "a reasonable probability" of a different outcome absent trial counsel's error. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694; *In re Alvernaz*, *supra*, 2 Cal.4th at pp. 936-937; *Hoyt*, *supra*, 8 Cal.5th at p. 958.)

Second, the facts in *Stewart* are not on "all fours" with the instant matter. There, defendant's withdrawals were in the open; he even discussed them with the company bookkeeper. (*Stewart*, *supra*, 16 Cal.3d at p. 137.) Here, Latiolait employed an elaborate set of transactions to hide his taking of company funds. In further contrast, the father-in-law in *Stewart* testified that he authorized at

least one withdrawal for defendant's home improvements, and had given him permission to withdraw company funds "from time to time." (*Id.* at p. 138.) Here, Partridge was steadfast in testifying that he never authorized Latiolait to take any of the invoiced funds. Finally, in *Stewart*, the jury, through its questions of the trial court, struggled with the concept of "fraudulent intent," yet the court gave no further instruction even though claim of right was defendant's only defense. (*Id.* at p. 142.) It was in this factual context—so different from the case at bar—that the *Stewart* court held that the absence of instructions on the relevance of defendant's good faith belief and open withdrawal of the funds was prejudicial error.

2.    On page 15, the following paragraph is added as a footnote at the end of the last sentence in the first paragraph, which reads, "The only conclusion that we can reach based on Latiolait's argument and the jury's verdict is that the jury wholly rejected Latiolait's explanation.":

This distinguishes Latiolait's case from *People v. Hussain* (2014) 231 Cal.App.4th 261 (*Hussain*). In *Hussain*, the court noted the jury's "struggle[ ] with the element of intent on [the grand theft] charge, asking specifically how specific intent related to the elements of grand theft. The jury acquitted [the defendant] on every charge except [the grand theft charge], as to which it was not properly instructed." (*Id.* at p. 271.) The court acknowledged that there were "problem areas" with the defendant's testimony in the case, and that "the jury *could have* rejected some or even all of it." (*Ibid.*, italics added.) "The acquittals on other charges, however, indicate the

jury, who saw defendant testify and thus could assess his credibility, *did not reject defendant's testimony entirely*." (*Id.* at p. 272, italics added.) The record here leaves no such latitude. Both the People and Latiolait required the jury to choose whether to believe Latiolait's testimony. As explained above, the record demonstrates that the jury rejected Latiolait's testimony.

This modification effects no change in the judgment. Appellant's petition for rehearing is denied.

_____

   CHANEY, J.     BENDIX, Acting P. J.    SINANIAN, J.*

_____

     * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B296973 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA457079) |
| v. | |
| PHILLIP JOHN LATIOLAIT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  Affirmed.

Bahar Law Office and Sarvenaz Bahar for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Phillip John Latiolait of grand theft by embezzlement (Pen. Code, § 487)[1] and found true an allegation that the value of the property Latiolait took exceeded $200,000. Latiolait contends that we should reverse the trial court's judgment because the trial court failed to instruct the jury regarding unanimity. He also contends that his trial counsel's failure to request a jury instruction regarding the "claim of right" defense (§ 511) and his trial counsel's insistence on introducing evidence of Latiolait's settlement of civil claims arising out of the events that led to his conviction each independently constituted ineffective assistance of trial counsel. We disagree with Latiolait's contentions and affirm the trial court's judgment.

## BACKGROUND

Latiolait began working for Smith-Emery Laboratory, an engineering firm owned by James Partridge that tests construction materials, as a laboratory manager. By the time Smith-Emery terminated Latiolait in 2013, he was a vice president and one of four signatories—each of whom could cosign company checks with one other signatory—on the company's bank accounts to pay the company's vendors.

Isabel Magno was in charge of accounts payable at Smith-Emery. Smith-Emery employees submitted vendor invoices to their supervisors, who approved the invoices by initialing them and submitted them to Magno. Magno printed checks, requested signatures from two of the four signatories, and sent the signed checks to vendors. Signatories signed checks typically once or twice a week, and signed between 200 and 400 checks per week.

---

[1] Further statutory references are to the Penal Code.

Separate from his work at Smith-Emery, Latiolait owned NUS Industries, LLC. Latiolait testified that he formed NUS as "a way to transfer [his] tax accounting for" a franchise he owned "into [his] personal account." At some point, Latiolait also established ECG as a fictitious business name for NUS. According to Latiolait, he established ECG as a way "to receive payment from . . . Partridge that [was] not payroll related."

Beginning in 2010, Latiolait created purchase orders from Smith-Emery to ECG, corresponding invoices from ECG to Smith-Emery, and, at times, other supporting documentation for services that never happened. Smith-Emery purchase orders noted that they were "Approved By: John Latiolait." Some invoices were stamped "RECEIVED BY: JOHN LATIOLAIT." Latiolait approved the documents for payment, typically by writing "OK to pay" and signing and dating either the invoice or the purchase order. After he created the purchase orders, invoices, and supporting documents and approved the invoices for payment, Latiolait submitted the information to Magno. Magno printed the checks payable to ECG, secured signatures, and gave the signed checks—per his instructions—directly to Latiolait.[2]

Latiolait testified that Partridge instructed him to create ECG and invoice Smith-Emery as a way for Smith-Emery to

---

[2] The address Latiolait used for ECG on invoices and purchase orders belonged to Ram Tech Laboratory, owned by Steven Berrgren. Before he started Ram Tech, Berrgren was a field engineer for an entity that did business with Smith-Emery; Berrgren testified that he had "infrequent" contact with Latiolait. Berrgren testified that he had never rented space to Latiolait and had never heard of ECG.

3

increase Latiolait's compensation without anyone else at Smith-Emery knowing.[3]  Partridge denied doing so.

From October 8, 2010 to May 30, 2013, Smith-Emery issued 72 checks to ECG for a total amount of $330,850.  The checks were endorsed with a stamp for deposit only to an NUS Industries account.

Smith-Emery terminated Latiolait in August 2013.  After terminating Latiolait, Smith-Emery filed civil suits seeking, among other relief, return of the money Latiolait moved through ECG and NUS.  The suits eventually terminated with settlements between Smith-Emery, Latiolait, and Smith-Emery's insurer.

On June 19, 2018, the People filed a one-count information charging Latiolait with grand theft by embezzlement under section 487, subdivision (a) of "[m]oney, in the amount of

---

[3] Seismic Structural Design Associates (SSDA), another of Partridge's companies, paid Latiolait $80,059 in April 2009 with a check made out to "John Latiolait."  Latiolait testified that the payment was intended to raise his 2009 compensation for work done for Smith-Emery.  Partridge testified that the payment was for work Latiolait had done for SSDA.

Partridge testified that at some point during his employment, Latiolait had also taken an additional approximately $100,000 through some means involving wire transfers and China.  The attorney who represented Smith-Emery against Latiolait testified that at the time Smith-Emery filed its lawsuit for damages, it did not allege a specific amount of money taken because "we found out there was a second scheme" involving a "Chinese bank."  Latiolait testified that the wire transfers from a Chinese bank account to Latiolait's NUS Industries account was payment for work he did in China.

4

$330,850." On August 27, 2018, the jury returned a guilty verdict on the embezzlement count and found true an allegation that the value of the property Latiolait took exceeded $200,000.

On March 21, 2019, the trial court denied Latiolait's motion for new trial and sentenced him to two years in county jail. Latiolait filed a timely notice of appeal.

## DISCUSSION

Latiolait challenges the judgment on three grounds. First, he contends that evidence regarding Latiolait's wire transfers between China and his NUS Industries bank account required the trial court to instruct the jury, on its own accord, regarding unanimity of the verdict. Second, Latiolait contends that his trial counsel was ineffective because trial counsel did not request a "claim of right" jury instruction based on Latiolait's testimony that he set up the elaborate scheme by which he took $330,850 from Smith-Emery and deposited into his NUS Industries bank account at Partridge's request and instruction. Finally, Latiolait argues that trial counsel was ineffective because trial counsel sought to introduce—over the trial court's warning and the People's objection—to introduce evidence regarding the settlement of the civil suits Smith-Emery filed against Latiolait.

### A. Unanimity Instruction

"[A]ssertions of instructional error are reviewed de novo." (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838.)

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the

5

crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)

Latiolait contends that the evidence presented to jurors described two separate schemes that might have constituted embezzlement.[4] The first scheme, according to Latiolait, was the ECG purchase order-invoice scheme. The second scheme involved wiring funds from China to Latiolait's NUS Industries bank account.

The People counter that they elected to prove Latiolait's embezzlement through his ECG purchase order and invoice scheme. The People expressly defined the election very quickly after beginning closing argument: "The actual amount of the theft is $330,850." The People laid out the contours of the scheme that it was asking the jury to focus on: "The defendant was in a position wherein he not only approved those invoices but he was a signer on the account. So every time the defendant not only submitted the invoice to Ms. Magno he was also the one who approved it so that she would cut the check, and then he took that check some of the time he signed it or it would be another

---

[4] Latiolait does not argue here that a unanimity instruction would be required if the record contained evidence regarding only one of the two schemes. We therefore do not consider whether either of the two schemes Latiolait identifies consisted of a continuous course of conduct. (Cf. *People v. Leonard* (2014) 228 Cal.App.4th 465, 491.)

6

one of the vice presidents or even Mr. Partridge himself." The People discussed the "fake company" Latiolait created and referenced the fake company's "fake address."

The record demonstrates that what Latiolait calls the "China Scheme" was a component of Latiolait's "claim of right" defense. At trial, there was minimal—almost no—prosecution witness testimony regarding the so-called China scheme. Partridge's testimony regarding the China scheme was that he was aware some money had been taken, but had no independent recollection about how much. When the People refreshed his recollection, he testified that the amount was "approximately $100,000." The only other prosecution witness who testified about the China scheme was Smith-Emery's attorney: "We thought that there was one scheme that Mr. Latiolait had employed and then we found out there was a second scheme and Mr. Latiolait did not tell us about and [*sic*] the second scheme involved." The witness clarified that the "second scheme" referred to the "Chinese bank." The only testimony regarding the logistics of the scheme—how he took the money, where it was transferred from and to, how and why the companies through which the money was funneled were set up—was Latiolait's direct testimony. There was no follow-up on cross-examination.

After the jury delivered its guilty verdict, Latiolait retained new counsel and filed a motion for new trial that addressed, among other issues, whether trial counsel's failure to request a unanimity instruction constituted ineffective assistance of counsel. At the initial hearing on that motion, the trial court explained that it was surprised to see the issue in the motion because it intended to give the instruction and agreed with Latiolait that the instruction "should have been given." After

7

hearing additional argument, the trial court requested additional briefing regarding the unanimity instruction and set the motion for further hearing.

At the continued hearing, the trial court explained that it had initially considered (and thought necessary) a unanimity instruction based on the fact that Latiolait's conduct charged as a single count of embezzlement consisted of 72 separate transactions. Latiolait clarified that his argument was not based on any sort of continuous course of conduct theory, but rather on the existence of two different potential "schemes"—the ECG scheme and the China scheme. At various other points in the hearing, the trial court clarified its understanding of the evidence presented: "It was clear that [the China scheme] was not the— what the People were arguing as the gravamen of the charge here. And I think it was very clear to the jurors that was the situation, that it was, in fact, checks and the checks alone that the People were arguing as constituting the basis for the offense." The trial court acknowledged, understood, and rejected Latiolait's argument: "And I know to the extent that you're saying that the China incident was completely different, you're suggesting that the jurors considered that as a possible basis for finding that [Latiolait] was guilty of grand theft. And understand that I understand that argument, and, you know, when this is ultimately considered by a court higher than this one, if that should occur, that court will understand that position. [¶] But understand, my response to that was that the evidence was just so clear. I mean I pointed it out in this tentative order, but the evidence was just so clear that he committed this crime of the thefts *that it would be lacking in common sense to consider that he was convicted for anything other than that and that that is the*

8

*evidence upon which the People argued his guilt in this case.*"
(Italics added.)

The People created a clear record about the theory under which they were seeking a conviction and the facts supporting it from the beginning of the People's opening statement, through the presentation of evidence, and to the very end of rebuttal argument.  The People introduced no documentary evidence regarding the wire transfers Latiolait initiated from China and called no witnesses to testify about the mechanics of that scheme.  And while it would be impractical for us to reproduce the People's entire rebuttal argument here, we note that the last thing the jury heard before instruction and deliberation was, *again*, the People's election:  "You know there's one thing to remember.  One thing to remember in a white-collar case.  It does not matter whether it's a million dollars loss or $300,000 loss.  You follow the money.  And that's all that was done here.  There are always shell companies, however, normally the money gets through a couple of companies and you can't trace where it ends up.  In this case it's really simple because these fraudulent invoices [are] submitted[,] the check is paid and the defendant submits them into that Bank of America account 7991.  And when you look at the records pertaining to that account it's clear that [Latiolait] owned the account.  It's not been funneled off to another account, it's not a shell corporation that you can't see when you look at it when you, when you do a search warrant and you get the records.  It's really clear that he owned the account that is NUS Industry doing business [as] ECG.  That account was opened in September 2nd 2008 that this other 6301 NUS doing business as [Mathnasium] some type of tutoring company and that's not open until 2012.  Take a look at the records.  The Secretary of State

9

document, the Secretary of State document shows that NUS doing business as ECG was opened and created in May 2008. You know from the evidence back in 2004 that the defendant was thinking of opening a calibration business. That's when he was over at 'Ram Tech' Industry. I was talking to the witness about oh maybe I can rent space from you. And 2011, 2012 he told me that he had an opportunity to purchase the calibration business . . . . He opened the [NUS Industry] business and he opens the—and creates the company first, right, and you can see from the Secretary of State document he opens this bank account so he is thinking about a business, but he does not quite have the courage to go through it. So he continues to work for Smith-Emery and he takes a lot of pride for Smith-Emery and he is a smart man. You know the problem is he's got a deal, he's got a contract for an agreement of payment agreement with Mr. Partridge and Mr. Partridge has decided this is your salary, this is your benefits including the car, whatever else, right, but the defendant is sitting there and he thinks he's more important and worth more. So he thinks it's okay for him to take a little off the top, and he does it by this scheme. . . . [¶] . . . This is really a simple case and there's the one element for you to decide and that is simply whether or not the defendant converted . . . Smith-Emery money for his own use? Did he create that scheme, that elaborate scheme and stand waiting to get the check always having to be in a rush or does it make sense his entire story to you? [¶] . . . At this time I'm going to ask you to find the defendant guilty of count 1 the crime of grand theft, the theft of $300,850 and I will ask you to find the special allegations that the defendant had stolen more than $200,000 to be true."

The People's election is evident on the face of the record. From the filing of a single embezzlement count identifying a specific dollar amount that coincides exactly with the amount Latiolait took through the ECG scheme, to closing argument, where the People specifically repeated that dollar amount and repeatedly described the ECG scheme, the People made and communicated to the jury a clear election. The People expressly asked the jury to consider whether Latiolait's conduct in the ECG scheme constituted grand theft by embezzlement. There was no similar request based on the so-called China scheme. Based on that election, we conclude the trial court was not required to instruct the jury regarding unanimity.

## B. Ineffective Assistance of Counsel

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' [Citation.] To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*).) "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel

11

[citation], and *there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' "* (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437, italics added.)

To demonstrate prejudice, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*In re Alvernaz* (1992) 2 Cal.4th 924, 936-937; *Hoyt, supra* 8 Cal.5th at p. 958.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland v. Washington* (1984) 466 U.S. 668, 695.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Id.* at p. 697; accord, *In re Fields* (1990) 51 Cal.3d 1063, 1079.)

1. "Claim of Right" Defense

Section 511 states that "[u]pon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him." Latiolait's primary defense was that he did what he did because Partridge told him to do so; that Partridge wanted to increase Latiolait's compensation off the company's books so that no other Smith-Emery employee would know about the increased

12

compensation.  Latiolait argues that he attempted to assert a "claim of right" defense under section 511 by alleging that Partridge instructed him to create the ECG check scheme.  But Latiolait's counsel did not request a jury instruction to accompany that defense.[5]

We need not consider whether Latiolait's counsel was ineffective for failing to request a claim-of-right jury instruction because we conclude the failure to do so was not prejudicial. Both Latiolait and the People argued to the jury that the verdict turned entirely on whether the jury believed Latiolait's testimony that Partridge had instructed him to create the ECG check scheme with its attendant Secretary of State filings, fake business, fake business address to which no check was ever mailed, fake purchase orders, fake invoices, and fake supporting documentation, to cover a raise in salary that Partridge hoped to conceal from other Smith-Emery employees.

In spite of Latiolait's testimony to the contrary, the jury heard evidence from two witnesses that Latiolait admitted his crime when confronted.  One witness testified that Latiolait said, "I did not know it was that much," and another testified that Latiolait said, "I wonder[ed] how long it would take for you to find me out."  Latiolait admitted that he created the scheme and

---

[5] "It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent."  (*People v. Butler* (1967) 65 Cal.2d 569, 573, overruled on other grounds by *People v. Tufunga* (1999) 21 Cal.4th 935, 950; accord *People v. Selivanov* (2016) 5 Cal.App.5th 726, 768.)

executed every part of it, that he took the money and that he deposited the money in his own bank account. Meanwhile, other prosecution witnesses—Smith-Emery employees—testified that they were unaware of others' salaries, that they had traditionally received annual bonuses paid through the company's payroll system, and that the checks were always paid to them in their own names. Partridge testified about how he discovered the ECG scheme, hired a private detective to investigate it, and retained an attorney to handle the matter for Smith-Emery. And the jury heard evidence that Latiolait had paid substantially more than $300,000 to Smith-Emery and Smith-Emery's insurance company to settle civil suits arising from the allegations that he took the money.

The parties agreed in their respective closing arguments that guilt or acquittal turned on whether the jury believed Latiolait's story or all of the witnesses who contradicted Latiolait's story. Latiolait emphasized in closing that the jury's verdict should turn on whether it believed his story: "[T]he part I want to highlight to you is evidence direct or circumstantial . . . . [I]f there's two reasonable interpretation[s,] one of which points to the defendant's guilt and the other to his innocence, and in this case Partridge is saying John Latiolait had stolen the money and John Latiolait says it's part of his compensation, you must adopt that interpretation that points to the defendant's innocence which means you will return a not guilty verdict, and reject that interpretation that points to his guilt."

Latiolait's argument gave the jury an all-or-none proposition; Latiolait was either authorized to take all 72 checks or none and if the jury found both scenarios possible, it had to acquit. Latiolait did not give the jury the option to believe

14

Latiolait's testimony partially—that some of the checks were authorized and others were not. The only conclusion that we can reach based on Latiolait's argument and the jury's verdict is that the jury wholly rejected Latiolait's explanation.

In making a prejudice determination, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." (*Strickland v. Washington, supra*, 466 U.S. at pp. 695-696.) It is evident that the jury wholly rejected Latiolait's assertion that Partridge told him to create the ECG scheme, and a claim-of-right instruction would not have changed that. Based on the entirety of the record, we cannot conclude that there is a reasonable probability that the jury would have reached a different result had Latiolait's attorney requested a claim-of-right instruction.

2. Evidence of Settlement of Civil Suits

Latiolait contends that his attorney's request to discuss Smith-Emery's civil suits against him and their disposition

15

constituted ineffective assistance of counsel. The evidence was the subject of extended trial court argument shortly before opening statements; the People objected to the introduction of "any questions regarding the civil lawsuit[s] and result of the civil lawsuit[s]." Latiolait's counsel argued that the lawsuits were relevant because they "show[ed] the pattern of harassment by Mr. Partridge over the years against" Latiolait. Counsel continued: "[Partridge is] trying to use his corporation, his money . . . to harass my client. [Latiolait has] been forced to defend two lawsuits and now this, and it's absolutely relevant and it's crucial to my client's defense." The People argued that if counsel were allowed to introduce evidence of the civil suits, then "it's only fair to show that in fact [the lawsuits were] resolved and the defendant settled for $300,000 and that is consciousness of guilt on his part." The trial court probed Latiolait's attorney: "Are you sure you want to get into that? It looks awfully suspicious. . . . I mean strategically is that what you really want to present to the jurors or you want to consider . . . not mentioning these lawsuits?"

Latiolait's attorney continued to argue that the evidence was necessary to impeach Partridge's testimony and to demonstrate that the proceedings were part of a pattern of relentless harassment that Latiolait would have done anything to escape. In closing, Latiolait's attorney made the argument he told the trial court he wanted to make: "There's many reasons to settle a civil lawsuit. . . . Many civil suits outweigh the cost of settlement and it costs a lot to defend. . . . Smith-Emery [is a] 15 million dollar company against one person John Latiolait. James Partridge has all the resources he wants and at his disposal. . . . No admission . . . that [Latiolait] did anything wrong. Basically

16

the money dispute you want your money back here it is and leave me alone.  You know at some point enough is enough."

Latiolait argues that there was no reasonable tactical reason for Latiolait's attorney to introduce evidence regarding the civil lawsuits and settlement.[6]  Because the trial judge asked and Latiolait's attorney responded with the reasons he wanted the evidence, Latiolait's argument here is focused on the reasonableness of that tactical decision.

In addition to counsel's stated reasons for seeking to introduce evidence regarding Smith-Emery's civil lawsuits against Latiolait and the parties' settlement, a rational defense attorney might consider evidence regarding settlement as favorable to a defendant.  It is possible that Latiolait's counsel believed evidence that Latiolait had repaid the money he took from Smith-Emery would influence the jury's decision whether to convict.

It appears that the trial court and the People believed Latiolait's strategy was ill-advised.  Latiolait's attorney argued his point vigorously, and convinced the trial court to allow the evidence.  Latiolait's argument is effectively that because his attorney's strategy did not yield a successful outcome, it cannot be characterized as rational.

---

[6] Latiolait relies on authority regarding the admissibility of civil suits and settlements in criminal matters.  The question here is not whether the trial court would have erred by excluding the evidence based on the People's objection.  (See *People v. Fuiava* (2012) 53 Cal.4th 622, 722.)  Rather, the question here is whether there could have been any rational tactical purpose for trial counsel to have sought the evidence's admission.  (See *People v. Lopez* (2008) 42 Cal.4th 960, 972.)

17

That a strategy failed does not mean that there was no strategy or that it was not rational. The trial judge probed Latiolait's attorney and explored with both Latiolait's attorney and the People the consequences of introducing the evidence. At each turn, Latiolait's attorney demonstrated that he was making a calculated choice based on a defined strategy. Moreover, without speculating about jury deliberations, we cannot determine whether the strategy had a positive effect. It obviously did not yield an acquittal. But acquittal is not the standard for determining whether trial counsel effectively assisted the defendant. We therefore reject Latiolait's argument that his attorney's introduction of the civil suits and settlement constituted ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED

                                            CHANEY, J.

We concur:

BENDIX, Acting P. J.       SINANIAN, J.*

---

     * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18